UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

GERALD ALTOMARE,

                    Plaintiff,

          - against -

WELLS FARGO SECURITIES, LLC,
WELLS FARGO ADVISORS, LLC,
WACHOVIA CORPORATION, WELLS
FARGO & COMPANY, RICHARD
SANDULLI, and RICHARD SILVA,

                    Defendants.

**MEMORANDUM
OPINION & ORDER**

09 Civ. 9702 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

          Plaintiff Gerald Altomare alleges that corporate defendants Wells Fargo &

Company, Wells Fargo Securities, LLC, Wells Fargo Advisors, LLC, and Wachovia

Corporation,[1] (collectively "Wachovia" or the "Company"), and individual defendants Richard

Sandulli and Richard Silva (collectively, with the corporate defendants, "Defendants"),

discriminated against him on the basis of age in violation of the Age Discrimination in

Employment Act ("ADEA"), 29 U.S.C. § 621 et seq., the New York State Human Rights Law

("NYSHRL"), N.Y. Exec. Law § 290 et seq., and the New York City Human Rights Law

("NYCHRL"), N.Y. City Admin. Code § 8-101 et seq.[2]  Plaintiff claims that Sandulli and Silva –

his supervisors at Wachovia – "denied [him] a promised promotion and terminated him on the

basis of his age."  (Cmplt. ¶ 58; see also id. at ¶¶ 64, 69)

---

[1]  Wells Fargo & Co. acquired all of Wachovia Corp.'s outstanding shares in 2009, after
Plaintiff's employment at Wachovia was terminated.  (Cmplt. ¶ 15)
[2]  The corporate defendants are named in the ADEA cause of action, while all defendants are
named in the NYSHRL and NYCHRL causes of action.  (Cmplt.)

Plaintiff also asserts a <u>quantum</u> <u>meruit</u> claim against the corporate defendants, alleging that they wrongfully refused to pay him a bonus after terminating his employment in 2008.  (<u>Id.</u> at ¶¶ 72-77)

Defendants have moved for summary judgment on all of Plaintiff's claims.  For the reasons stated below, Defendants' motion will be granted as to the <u>quantum</u> <u>meruit</u> claim but will otherwise be denied.

## BACKGROUND

The evidentiary record here is replete with factual issues.  The parties dispute, <u>inter</u> <u>alia</u>, who hired Plaintiff to work at Wachovia; what Plaintiff was hired to do; how well he performed his duties; why he was not promoted; and the reasons for his termination.  The parties also make conflicting factual claims about whether there was a pattern of age discrimination in the Wachovia unit supervised by Sandulli and Silva.

## I.    PLAINTIFF'S EMPLOYMENT HISTORY PRIOR TO JOINING WACHOVIA

Plaintiff Altomare holds a master's degree in business administration from the University of Chicago, has twenty years of experience in the financial services industry, and had worked at four separate financial services firms with Defendants Sandulli and Silva before joining them at Wachovia.  (Halter Decl., Ex. 1 (Altomare Dep.) at 13-14, 25)

Plaintiff first worked with Sandulli and Silva at Dean Witter in the early 1990s, where Altomare worked on structuring and marketing equity products.  (Def. R. 56.1 Stmt. ¶¶ 1-2)[3]  At Dean Witter, Altomare and Sandulli had frequent contact.[4]  (<u>Id.</u> ¶ 3)

_____

[3]  This Court relies on facts drawn from a party's Rule 56.1 statement where the opposing party has admitted those facts or has not controverted them with citations to admissible evidence.  <u>See</u> <u>Giannullo v. City of New York</u>, 322 F.3d 139, 140 (2d Cir. 2003) ("If the opposing party . . . fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted.") (citations omitted).  Where Plaintiff disagrees with Defendants'

In 1992, Sandulli left Dean Witter to join Merrill Lynch's global equity derivatives desk, where Silva joined him a year later.  (Id. ¶ 4)  Altomare subsequently also joined Merrill Lynch, where he worked closely with Sandulli structuring and marketing equity derivatives.  (Id. ¶ 5)  While working at Merrill Lynch, Altomare and Sandulli socialized outside the office, and Altomare, Sandulli, and Silva attended each other's weddings.[5]  (Id. ¶ 6)

In 1995, Altomare and Sandulli left Merrill Lynch to join the institutional structured products group at Morgan Stanley.  (Id. ¶ 7)  Altomare reported to Sandulli from 1997 to 1999.  (Id. ¶ 8)  In 2000, Silva also joined Morgan Stanley.[6]  (Id. ¶ 9)

Altomare left Morgan Stanley in 2003, and until January 2006, focused solely on personal investments and business ventures.  (Id. ¶ 12)

## II.     PLAINTIFF IS HIRED AT WACHOVIA

Sandulli and Silva left Morgan Stanley in July 2005, joining Wachovia as co-heads of the Equity Structured Products Group (the "Group").  Sandulli and Silva reported to Quinten Stevens, the head of Wachovia's Equity Division.  (Id. ¶ 13)  After joining Wachovia, Sandulli and Silva recruited to their new company most of the employees in their group at Morgan Stanley.  (Def. R. 56.1 Stmt. ¶ 14; Pltf. R. 56.1 Counter-Stmt. ¶ 14; Halter Decl., Ex. 2 (Silva Dep.) at 32-33, Ex. 3 (Sandulli Dep.) at 41-42)

---

characterization of the cited evidence, and has presented an evidentiary basis for doing so, the Court relies on Plaintiff's characterization of the evidence.  See Cifra v. Gen. Elec. Co., 252 F.3d 205, 216 (2d Cir. 2001) (court must draw all rational factual inferences in non-movant's favor in deciding summary judgment motion).

[4]  Altomare claims that he had much less contact with Silva at Dean Witter.  (Pltf. R. 56.1 Counter-Stmt. ¶ 3; Altomare Aff. ¶ 3)

[5]  Altomare asserts that he rarely interacted with Silva while at Merrill Lynch, however, and did not socialize with him outside of the office.  (Pltf. R. 56.1 Counter-Stmt. ¶ 6; Altomare Aff. ¶ 4; Halter Decl., Ex. 1 (Altomare Dep.) at 27-28)

[6]  Altomare asserts that he interacted only rarely with Silva while working at Morgan Stanley. (Pltf. R. 56.1 Counter-Stmt. ¶ 9; Altomare Aff. ¶ 6)

In late 2005, Sandulli and Silva discussed the possibility of hiring Altomare (Def. R. 56.1 Stmt. ¶ 16), and in early 2006, Sandulli approached Altomare about joining the Group. (Id. ¶ 17)  Sandulli indicated that he had a broad mandate from the Company to grow the equity derivatives business and told Altomare that he would enter the Group as a senior member.  (Id. at ¶¶ 17-18)  After Sandulli had offered Altomare a position in the Group, and after the two men had negotiated the terms of Altomare's employment, Altomare met with Silva and Ajay Khanna, the head of the Equity Derivatives Trading Desk, as well as other members of the Group, some of whom Altomare knew from Morgan Stanley.  (Pltf. R. 56.1 Counter-Stmt. ¶ 19; Altomare Aff. ¶ 9; Halter Decl., Ex. 1 (Altomare Dep.) at 56-57)

The parties dispute many of the details concerning Altomare's discussions with Sandulli during the recruitment process.  Defendants assert that Sandulli made clear that he and Silva were co-heads of the Group (Def. R. 56.1. Stmt. ¶ 17), while Altomare claims that Sandulli described Silva as junior to Sandulli (as had been the case at Morgan Stanley).  Altomare asserts that Sandulli told him that Sandulli would be "in charge."  (Pltf. R. 56.1 Counter-Stmt. ¶ 17; Altomare Aff. ¶ 9; Halter Decl., Ex. 1 (Altomare Dep.) at 57-58)  Similarly, Defendants assert that Altomare was hired solely to "develop new, innovative insurance products and ideas to sell to clients" (Def. R. 56.1. Stmt. ¶ 18), while Altomare claims that his duties were described as much broader, and extended to then-existing lines of business.  (Pltf. R. 56.1 Counter-Stmt. ¶ 18; Altomare Aff. ¶ 8)  Altomare also claims that "Sandulli promised Altomare [that] he would be promoted to co-head of the Group after the Group became comfortable with him."  (Pltf. R. 56.1 Counter-Stmt. ¶ 18; Halter Decl., Ex. 1 (Altomare Dep.) at 51-53, 101-02)

In January 2006, Altomare accepted Sandulli's offer to join the Group as a Managing Director, reporting directly to Sandulli and Silva.  (Pltf. R. 56.1 Counter-Stmt. ¶ 20)

Pursuant to his offer letter, Altomare was to receive a salary of $200,000 with a guaranteed

bonus of at least $1,175,000 in 2006.  (Turnbull Aff., Ex. 8)  Future bonuses were subject to

Wachovia's Incentive Compensation Plan for Corporate & Investment Banking ("Plan").  (Id.)

> The Plan states that
>
> [t]o be eligible to receive an incentive award under the Plan, participants
> must be employed on the Pay-Out Notification Date (the date on which
> participants are informed of the amount of their incentive award, which
> generally occurs after the end of the performance year, in late January of
> the following year. . . .
>
> Plan participants who terminate employment, for any reason, voluntarily
> or involuntarily, prior to the Pay-Out Notification Date will not be deemed
> to have earned any award under the Plan.   However, the Plan
> Administrator, in its sole discretion, may choose to provide an award to
> any participant whose employment terminates as a result of death,
> disability, retirement or displacement prior to the Pay-Out Notification
> Date.   The amount of any such award will be determined in the sole
> discretion of the Plan Administrator, and, to receive such an award, the
> participant (or his/her beneficiary) must sign a general release and waiver
> in a form approved by the Plan Administrator.

(Turnbull Aff., Ex. 9 at WF 041777-78, WF 041781-82)  The Plan also states that the amount of

any bonus is "determined subjectively" on the basis of, inter alia, individual and group

performance and market conditions.  (Id. at WF 041779)

Altomare's offer letter did not provide that Altomare would be promoted to co-

head of the Group in the future.  (Id., Ex. 8)

The parties dispute whether Sandulli and Silva made the decision to hire Altomare

together.  Defendants rely on Sandulli's deposition for this assertion (see Def. R. 56.1. Stmt. ¶ 15

(citing Halter Decl., Ex. 3 (Sandulli Dep.) at 49, 271)), but the cites offered by Defendants do not

address Altomare's hiring.  Altomare's deposition indicates that he does not know what Silva's

role was in his hiring:  "Q.  And do you know whether Mr. Silva was in agreement with Mr.

Sandulli in hiring you?  A.  Hiring me?  I'm not sure at this point."  (Halter Decl., Ex. 1

(Altomare Dep.) at 184)  The Court concludes that Silva's involvement in Altomare's hiring presents a question of fact for a jury.

## II.      PLAINTIFF'S EMPLOYMENT AT WACHOVIA

### A.      Duties and Job Performance

Altomare's employment at Wachovia began on February 14, 2006 – when he was 48 years old – and ended twenty-seven months later, on May 13, 2008.[7]  (Def. R. 56.1 Stmt. ¶¶ 23, 59)  While employed at Wachovia, Altomare was in charge of the Company's pre-existing equity hedge fund finance and OTC options hedging businesses.  (Id. ¶ 31; Altomare Aff. ¶ 10) Sandulli testified that he expected Altomare to spend 30 to 50% of his time on these businesses. (Pltf. R. 56.1. Counter-Stmt. ¶ 31; Halter Decl., Ex. 3 (Sandulli Dep.) at 306)  Sandulli expected that Altomare would spend the remainder of his time developing and selling new insurance-related products (Halter Decl., Ex. 3 (Sandulli Dep.) at 306), while Altomare maintains that Sandulli never told him that he was hired to focus on developing new insurance-related products. (Id., Ex. 1 (Altomare Dep.) at 47-49)

The parties disagree as to Altomare's job performance at Wachovia.  There is evidence that revenues in the pre-existing Wachovia businesses – which Sandulli expected Altomare would spend as much as 50% of his time on – grew dramatically during his tenure. (Pltf. R. 56.1. Counter-Stmt. ¶¶ 27, 82, 83; Halter Decl., Ex. 7 (Lloyd Dep.) 35-38, 44-45) Quinten Stevens, who supervised Sandulli and Silva, testified that the businesses for which Altomare was responsible generated approximately $10 million in annual revenue.  (Halter Decl., Ex. 5 (Stevens Dep.) at 88-90; Pltf. R. 56.1 Counter-Stmt. ¶ 76)  The parties agree that

---

[7] Sandulli and Silva advised Altomare of his termination on May 13, 2008.  (Def. R. 56.1 Stmt. ¶ 59)  Although Altomare did not perform any services for the Company after that date, the Company paid him through August 14, 2008, his official termination date.  (Id. ¶ 61)

Altomare developed new financial products in 2006 and 2007 (Def. R. 56.1 Stmt. ¶¶ 25-26), but disagree as to whether the products generated revenue for the firm.  (Def. R. 56.1 Stmt. ¶¶ 25-26; Altomare Aff. ¶ 12)

Sandulli's 2006 Performance Appraisal concerning Altomare – issued in early 2007 – rated his job performance as "excellent."  (Halter Decl., Ex. 12)  Sandulli stated that Altomare had "strong skills across the board in all disciplines" and that he had "laid the groundwork for a number of key initiatives for 2007 and beyond.  He has helped in the development of a number of critical projects involving insurance companies' hedge funds. . . . Jerry is on his way to a highly profitable 2007."  (Id.)  Wachovia's 2007 "Performance and Development Plan" – signed by Altomare on April 11, 2008, five weeks before he was terminated – rated his overall performance as "good."  (Halter Decl., Ex. 16 at WF 000167) According to the evaluation, Altomare's strengths included "developing high performing teams," "making sound business decisions and managing risk," and "managing for results."  (Id.) Neither the 2006 nor the 2007 performance appraisals reference Altomare's alleged failure to develop new insurance product business.

In January 2007 and January 2008, Altomare approached Sandulli about a possible promotion to co-head of the Group.  In 2007, Sandulli told Altomare that it was too early.  In 2008, Sandulli initially supported Altomare's request but then changed course after Silva objected.  (Halter Decl., Ex. 1 (Altomare Dep.) at 102-07)  In the end, neither Sandulli nor Silva supported Altomare's request.  (Pltf. R. 56.1. Counter-Stmt. ¶¶ 35-36)  The two men did present Altomare's promotion request to Stevens, head of the equity division, and he agreed that Altomare should not be promoted.  (Def. R. 56.1 Stmt. ¶¶ 38-39)

### B.  **Alleged Age-Related Remarks**

While Altomare was employed at Wachovia, the Group ranged in size from 20 to 25 individuals, including the co-heads.  (Halter Decl., Ex. 24 at 6-10)  Many Group members had known each other and worked together for many years.  (Def. R. 56.1 Stmt. ¶ 41; Halter Decl., Ex. 24 at 6-10)  Sandulli and Silva both considered Altomare to be a close friend (Def. R. 56.1 Stmt. ¶ 42), and Altomare socialized with Sandulli and – to a lesser extent with Silva – outside of work.  (Id. ¶¶ 43-44)

Members of the Group, including Altomare, occasionally joked with one another. (Id. ¶ 45)  Altomare alleges that many of the remarks his supervisors made to him were age-related.  Altomare asserts that Sandulli and Silva teased him about his receding hairline, and thinning and graying hair (Pltf. R. 56.1 Counter-Stmt. ¶ 47; Halter Decl., Ex. 1 (Altomare Dep.) at 166-67, 177-78), while Silva repeatedly commented on his alleged incontinence and need for Depends, or adult diapers.  (Pltf. R. 56.1 Counter-Stmt. ¶ 47; Halter Decl., Ex. 1 (Altomare Dep.) at 166-67)  Silva referred to Altomare as "the old guy."  (Halter Decl., Ex. 1 (Altomare Dep.) at 166)  Altomare claims that Silva told him that he wanted to "ditch" Larry Ster, a Wachovia consultant, because he was "even older" than Altomare.  (Id. at 167-68)  Altomare further alleges that Silva referred to older employees as "dinosaurs" who "didn't fit with the [Group's] business," which he described as a "young man's business."  (Id. at 168)  Altomare further claims that Silva referred to the older employees Sandulli had hired as "Sandulli's mistakes." (Altomare Aff. ¶ 19)

### IV.   **PLAINTIFF'S TERMINATION**

In early 2008, a reduction in force was implemented at Wachovia.  (Def. R. 56.1 Stmt. ¶ 51)  Sandulli and Silva selected Altomare and Kevin Klenke for termination.  (Id. ¶ 53,

56)  Sandulli and Silva informed Altomare of his termination on May 13, 2008.  Altomare was

50 years old at the time; Klenke was 49.[8]  (Id. ¶¶ 56, 59; Halter Decl., Ex. 24 at 7-8)

Defendants assert that both Altomare and Klenke were terminated for poor

performance.  (Def. R. 56.1 Stmt. ¶¶ 53, 56)  Defendants also note that Altomare was – after

Sandulli and Silva – one of the highest paid members of the Group, receiving compensation of

$1,400,000 in 2006 and $900,000 in 2007.  (Def. R. 56.1. Stmt. ¶ 54; Pltf. R. 56.1 Counter-Stmt.

¶ 54)  Plaintiff contends that he performed well at Wachovia, and was responsible for "tens of

millions of dollars in revenue from 2006 to 2008."  (Pltf. R. 56.1 Counter-Stmt. ¶ 76)  Plaintiff

argues that both his and Klenke's terminations were part of a pattern of age discrimination within

the Group.  (Pltf. R. 56.1. Counter-Stmt. ¶¶ 52, 56)

Altomare has offered evidence that between February 14, 2006, the date he was

hired, and August 14, 2008, the effective date of his termination, Sandulli and Silva terminated

seven individuals, all of whom were over the age of 40.  (Halter Decl., Ex. 24 at 6-10; Pltf. R.

56.1 Counter-Stmt. ¶¶ 64-67; Halter Decl., Ex. 2 (Silva Dep.) at 38-43)  Altomare has also

offered evidence that between February 14, 2006 and August 14, 2008, Sandulli and Silva hired

only three employees over the age of forty – two of whom were Altomare and Klenke, who were

later terminated – and hired seven employees under the age of thirty-four.

After Altomare was terminated, his responsibilities for the OTC options hedging

business were reassigned to Keshiv Desai (Halter Decl., Ex. 3 (Sandulli Dep.) at 291), who was

approximately 29 years old at the time.  (Id., Ex. 24 at 7)

Altomare did not receive a bonus for 2008.  (Id. ¶ 62)

---

[8]  Sandulli was 45 years old and Silva was 40 years old at the time of Altomare's termination.
(Def. R. 56.1. Stmt. ¶ 60)

## DISCUSSION

## I.     SUMMARY JUDGMENT STANDARD

Summary judgment is warranted where the moving party shows that "there is no genuine issue as to any material fact" and that it "is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." Beyer v. Cnty. of Nassau, 524 F.3d 160, 163 (2d Cir. 2008) (citing Guilbert v. Gardner, 480 F.3d 140, 145 (2d Cir. 2007)).  In deciding a summary judgment motion, the Court "resolve[s] all ambiguities, and credit[s] all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment."  Cifra, 252 F.3d at 216.

"The Second Circuit has 'repeatedly emphasized "the need for caution about granting summary judgment to an employer in a discrimination case where . . . the merits turn on a dispute as to the employer's intent."'" Papalia v. Milrose Consultants, Inc., No. 09 Civ. 9257(NRB), 2011 WL 6937601, at *7 (S.D.N.Y. Dec. 29, 2011) (quoting Gorzynski v. JetBlue Airways Corp., 596 F.3d 93, 101 (2d Cir. 2010) (quoting Holcomb v. Iona Coll., 521 F.3d 130, 137 (2d Cir. 2008))).  "Where an employer acted with discriminatory intent, 'direct evidence of that intent will only rarely be available, so . . . affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination.'" Gorzynski, 596 F.3d at 101 (quoting Holcomb, 521 F.3d at 137).

"It is now beyond cavil[, however,] that summary judgment may be appropriate even in the fact-intensive context of discrimination cases," and that "the salutary purposes of summary judgment – avoiding protracted, expensive and harassing trials – apply no less to discrimination cases than to . . . other areas of litigation."  Abdu-Brisson v. Delta Air Lines, Inc.,

239 F.3d 456, 466 (2d Cir. 2001) (internal quotation marks and citations omitted).  As in any

other case, "an employment discrimination plaintiff faced with a properly supported summary

judgment motion must 'do more than simply show that there is some metaphysical doubt as to

the material facts.' . . . [H]e must come forth with evidence sufficient to allow a reasonable jury

to find in [his] favor."  Brown v. Henderson, 257 F.3d 246, 252 (2d Cir. 2001) (quoting

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)).

   "Mere conclusory statements, conjecture or speculation" by the plaintiff will not

defeat a summary judgment motion.  Gross v. Nat'l Broad. Co., Inc., 232 F. Supp. 2d 58, 67

(S.D.N.Y. 2002); see also Holcomb, 521 F.3d at 137 ("Even in the discrimination context . . . a

plaintiff must provide more than conclusory allegations to resist a motion for summary

judgment.").  Instead, the plaintiff must offer "concrete particulars."  Bickerstaff v. Vassar Coll.,

196 F.3d 435, 451-52 (2d Cir. 1999) (disregarding plaintiff's Rule 56(e) affidavit because it

lacked "concrete particulars"); Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985) ("To allow a

party to defeat a motion for summary judgment by offering purely conclusory allegations of

discrimination, absent any concrete particulars, would necessitate a trial in all Title VII cases.").

## II. <u>DISCRIMINATION CLAIMS</u>

   "Under the Age Discrimination in Employment Act . . . it is 'unlawful for an

employer . . . to discharge any individual or otherwise discriminate against any individual with

respect to his compensation, terms, conditions, or privileges of employment, because of such

individual's age.'"  Roge v. NYP Holdings, Inc., 257 F.3d 164, 168 (2d Cir. 2001) (citing 29

U.S.C. § 623(a)(1)).

   The framework for analyzing ADEA cases is well established:

First, plaintiff bears the burden of establishing a <u>prima</u> <u>facie</u> case of age
discrimination.  Second, if plaintiff succeeds, the burden shifts to the defendant

"to articulate some legitimate, nondiscriminatory reason for its action."  Finally, if the employer articulates a legitimate, nondiscriminatory reason for its actions, "the burden is on the plaintiff to show that the proffered nondiscriminatory reason was merely a pretext for discrimination."

Scott v. WPIX, Inc., No. 10 Civ. 4622(WHP), 2011 WL 6425017, at *2 (S.D.N.Y. Dec. 21, 2011) (citations omitted).

### A.   **Prima Facie Case**

"To establish a prima facie case of age discrimination, a plaintiff must show:  1) membership in a protected age group; 2) qualification for the position; 3) an adverse employment decision; and 4) circumstances giving rise to an inference of discrimination."  Norville v. Staten Island Univ. Hosp., 196 F.3d 89, 96-97 (2d Cir. 1999) (citing Austin v. Ford Models, Inc., 149 F.3d 148, 152 (2d Cir. 1998), abrogated on other grounds by Swierkiewicz v. Sorema N.A., 534 U.S. 506 (2002)); see also Hooda v. Brookhaven Science Assocs., No. 08-CV-3403(JS)(WDW), 2011 WL 3918971, at *5 (E.D.N.Y. Sept. 2, 2011) (applying same standard in failure to promote case ) (quoting Witkowich v. Gonzales, 541 F. Supp. 2d 572, 578 (S.D.N.Y. 2008)).

"This burden is not a heavy one," Gorzynski, 596 F.3d at 107 (citing Carlton v. Mystic Transp., Inc., 202 F.3d 129, 134 (2d Cir. 2000)), but "a plaintiff's case must fail if [he] cannot carry this preliminary burden."  Beyer, 524 F.3d at 163.

Here, it is undisputed that Altomare has satisfied the first and third elements of his prima facie case.  (Def. Br. 14; Pltf. Br. 13)  Altomare is a member of a protected class – he was well over the age of 40 when he was denied a promotion and then terminated.  Moreover, both the failure to promote and the termination are adverse employment actions.  The Court will therefore turn to the elements of a prima facie case that are in dispute:  (1) whether Altomare was qualified for his position in the Group and for the position of Group co-head; and (2) whether the

circumstances of the failure to promote and the termination give rise to an inference of discrimination.

        1.     **Qualification Prong**

        Defendants argue that "Altomare did not perform his job satisfactorily, [and therefore] he was not qualified for either his own position, or for a promotion to tri-head the Group."  (Def. Br. 15)

        The Second Circuit has "long emphasized that the qualification prong must not be interpreted in such a way as to shift into the plaintiff's prima facie case an obligation to anticipate and disprove the employer's proffer of a legitimate, non-discriminatory basis for its decision."  Gregory v. Daly, 243 F.3d 687, 697 (2d Cir. 2001) (citing Powell v. Syracuse Univ., 580 F.2d 1150, 1155 (2d Cir. 1978)).  "To show 'qualification' sufficiently to shift the burden of providing some explanation for discharge to the employer, the plaintiff 'need not show perfect performance or even average performance.'"  Id. (citing Powell, 580 F.2d at 1155 (quoting Flowers v. Crouch-Walker Corp., 552 F.2d 1277, 1283 (7th Cir. 1977))).  Plaintiff "need only make the 'minimal showing' that '[]he "possesses the basic skills necessary for performance of [the] job."'"  Id. (quoting Owens v. New York City Housing Auth., 934 F.2d 405, 409 (2d Cir. 1991) (quoting Powell, 580 F.2d at 1155)); see also Slattery v. Swiss Reinsurance Am. Corp., 248 F.3d 87, 92 (2d Cir. 2001) ("[A]ll that is required is that the plaintiff establish basic eligibility for the position at issue, and not the greater showing that he satisfies the employer.").

        Here, the evidence demonstrates that Altomare holds an MBA from Chicago, holds Series 7 and Series 63 securities licenses, and has more than twenty years of experience in the financial services industry, having worked at Kidder Peabody, Dean Witter, Merrill Lynch, and Morgan Stanley before joining Wachovia.  (Halter Decl., Ex. 1 (Altomare Dep.) at 14, 25)

Moreover, Altomare has offered evidence that he substantially increased revenues for the established businesses he was responsible for at Wachovia.  (Id., Ex. 7 (Lloyd Dep.) at 44-46)

Sandulli rated Altomare's performance as "excellent" in 2006 and "good" in 2007 (Id., Exs. 12, 16), and stated that Altomare had "[s]trong skills across the board in all disciplines."  (Id., Ex. 1 (Silva Dep.) at 216, Ex. 12, at 2)  In 2006, Altomare was paid $25,000 more than he had been guaranteed, with Sandulli and Silva making up the difference from their own compensation.  (Id., Ex. 3 (Sandulli Dep.) at 312-13)  In 2007, Sandulli recommended to Wachovia's human resources department that Altomare receive a bonus of $935,000, on top of his $200,000 salary.  (Id. at 318-19)  Altomare ultimately was paid a discretionary bonus of $700,000 for that year.  (Id. at 312)

While Defendants argue that Altomare was not qualified for the position he held (or for the Group co-head position) because he had failed to generate significant revenue from new insurance-related products, there is a factual dispute about whether Altomare was hired for that narrow purpose, rather than to contribute to the business in whatever ways he could. Sandulli testified that Altomare's "mandate was relatively wide" and that the pre-established options and hedge fund financing businesses were always intended to account for as much as 50% of Altomare's time.  (Id. at 306)

Altomare has also offered testimony that Sandulli – who had known and worked with him for twenty years – had heavily recruited him to join the Group, had promised him the Group co-head job, and initially supported his request for a promotion until Silva objected.  (Id., Ex. 1 (Altomare Dep.) at 51-52, 101-08)

This evidence, considered as a whole, is sufficient to demonstrate that Altomare was qualified for the position he held and for the position he sought.  Accordingly, Altomare has satisfied the qualification element of his prima facie case.

### 2.        Inference of Discriminatory Intent

As with the "qualifications" prong of the prima facie case test, Plaintiff must satisfy a "low threshold" in demonstrating that the failure to promote and termination decisions were made under circumstances giving rise to an inference of discrimination.  Holcomb, 521 F.3d at 139.  "The circumstances that give rise to an inference of discriminatory motive include actions or remarks made by decisionmakers that could be viewed as reflecting a discriminatory animus."  Chertkova v. Conn. Gen. Life Ins. Co., 92 F.3d 81, 91 (2d Cir. 1996) (citing Ostrowski v. Atlantic Mut. Ins. Cos., 968 F.2d 171, 182 (2d Cir.1992)); see also Leibowitz v. Cornell Univ., 584 F.3d 487, 502 (2d Cir. 2009) (the necessary inference "may be derived from a variety of circumstances," including "'[an employer's] invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge'") (quoting Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 37 (2d Cir. 1994)).

"In general, 'a plaintiff's replacement by a significantly younger person is evidence of age discrimination.'"  Papalia, 2011 WL 6937601, at *9 (quoting Carlton, 202 F.3d at 135); see also Colon v. Trump Int'l Hotel & Tower, No. 10 Civ. 4794(JGK), 2011 WL 6092299, at *6 (S.D.N.Y. Dec. 7, 2011) ("Evidence that an employee was replaced by a substantially younger individual or an individual outside the protected class suffices to show circumstances giving rise to an inference of age discrimination.").  Moreover, "[e]vidence that defendant[s] discharged protected employees prior to plaintiff's discharge is admissible to prove

discriminatory intent as part of plaintiff's prima facie case."  Epstein v. Kalvin-Miller Int'l, Inc., 121 F. Supp. 2d 742, 748 (S.D.N.Y. 2000) (citing Kirsch v. Fleet Street, Ltd., 148 F.3d 149, 163 (2d Cir. 1998)).

　　　　　Here, Altomare has offered evidence that decision-makers – including particularly Silva – made numerous age-related comments to him.  While Defendants argue that any age-related comments were said in jest and do not demonstrate discriminatory animus, courts have held that such credibility determinations are for the jury and not for the Court at summary judgment.  For example, in Catalano v. Lynbrook Glass & Architectural Metals Corp., No. 06-CV-2907(JFB)(AKT), 2008 WL 64693 (E.D.N.Y. Jan. 4, 2008), defendant's president submitted an affidavit in which he maintained that any comment he made referring to plaintiff's age "'was merely a joke and was in no way related to any decisions pertaining to [p]laintiff's employment.'"  2008 WL 64693, at *9 n.5.  The court observed that "[i]t may well be that a jury may credit [the president's] testimony that any derogatory references to plaintiff's age were a joke and also credit the other evidence to which defendant has pointed to support their contention that plaintiff was fired because of his poor performance, rather than any pretext."  Id.  However, "it is not the role of the Court to make these credibility determinations on summary judgment; rather, it must assume that plaintiff's testimony will be credited and draw all reasonable inferences in plaintiff's favor."  Id. (citing Shager v. Upjohn Co., 913 F.2d 398, 402 (7th Cir. 1990) ("[T]he task of disambiguating ambiguous utterances is for trial, not for summary judgment."); Gipson v. Wells Fargo N.A., 460 F. Supp. 2d 15, 27 (D.D.C. 2006) ("Since there is a genuine issue as to any meaning in [the Area Manager's] comment, and since the meaning in that comment is material to the outcome of the case, the question must be presented to the jury for final resolution.")); cf. Kelly v. Lex, Inc., No. 03 Civ. 2778(GEL), 2004 WL 1752596, at *7

(S.D.N.Y. Aug. 4, 2004) ("[T]here is a serious factual dispute that largely turns on the credibility of various witnesses – in short, a classic jury question that is inappropriate for summary judgment.  [Plaintiff] avers that his comment to [his female coworker] was merely a joke, made in an atmosphere of locker room banter, with no reference to gender or race, and indistinguishable from teasing remarks that were commonly made between coworkers at [defendant company].  In contrast, [plaintiff] asserts that [his supervisor's] comment about him was offensive to both his race and gender, because comparisons of young black men to virile animals is freighted with the cultural history of stigmatizing black men as bestial or as sexually aggressive. . . . This core factual dispute . . . precludes summary judgment. . . .").  In sum, the issue of whether Silva's numerous age-related comments were innocuous or "bear a more ominous significance," Abdu-Brisson, 239 F.3d at 468, is for the jury.  See Holtz v. Rockefeller & Co., Inc., 258 F.3d 62, 78 (2d Cir. 2001) (employer's argument that plaintiff's evidence of discriminatory comments was not credible presents "a jury argument inappropriate on a motion for summary judgment") (citing Owens, 934 F.2d at 410).

Altomare likewise has offered evidence that he was replaced by a much younger employee, and that his termination was part of a trend within the Group, in which those over 40 years of age were steadily eliminated, while younger individuals were hired.  Together with the remarks evincing possible age animus, this proof is more than sufficient to meet Plaintiff's modest burden at the prima facie stage to demonstrate that a jury could draw an inference of discriminatory intent.

**B.** **Defendants' Proffered Reason for Failing
to Promote and Terminating Altomare**

Because Altomare has made out a prima facie case of age-based discrimination, "the burden of production shifts to the employer to proffer a legitimate, nondiscriminatory reason

for the action." Brennan v. Metropolitan Opera Ass'n, Inc., 192 F.3d 310, 316-17 (2d Cir. 1999) (citations omitted).  "'The defendant must clearly set forth, through the introduction of admissible evidence,' reasons for its actions which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action." St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 507 (1993) (quoting Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254-55 (1981)) (emphasis in original).

Here, Defendants contend that Altomare was not promoted and ultimately was terminated because of his failure to develop new and innovative insurance-related financial products that produced revenue for Wachovia.  (Def. Br. 18)  Defendants maintain that Altomare was hired for this specific purpose and that he failed in that task.  (Halter Decl., Ex. 3 (Sandulli Dep.) at 289-90, Ex. 2 (Silva Dep.) at 207-08)

Because Defendants have articulated a non-discriminatory reason for denying Altomare a promotion and terminating his employment, they have met their burden of production under the McDonnell-Douglas test.

C.      **Pretext**

"Once [a legitimate, non-discriminatory reason for the adverse employment action] is provided, the plaintiff can no longer rely on the prima facie case, but may still prevail if she can show that the employer's determination was in fact the result of discrimination." Gorzynski, 596 F.3d at 106 (citing Holcomb, 521 F.3d at 138).  Plaintiff must be given an "'opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.'" Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000) (quoting Burdine, 450 U.S. at 253). "That is, the plaintiff may attempt to establish that he was the victim of intentional

discrimination 'by showing that the employer's proffered explanation is unworthy of credence.'" Id. (quoting Burdine, 450 U.S. at 256).

Given the Supreme Court's decision in Gross v. FBL Fin. Servs., Inc., 557 U.S. 167, 129 S. Ct. 2343 (2009), the Second Circuit has determined that "'a plaintiff bringing a disparate treatment claim pursuant to the ADEA must prove, by a preponderance of the evidence, that age was the "but for" cause of the challenged adverse employment action' and not just a contributing or motivating factor." Gorzynski, 596 F.3d at 106 (quoting Gross, 129 S. Ct. at 2352).

"Where, as here, a plaintiff has established his prima facie case through evidence that the [failure to promote or] termination[] occurred in circumstances giving rise to an inference of discrimination, the plaintiff is permitted to rely on the same evidence to demonstrate pretext." Beirne v. Fieldcrest Cannon, Inc., No. 92 Civ. 3282(JFK), 1997 WL 187340, at *6 (S.D.N.Y. Apr. 16, 1997) (citing Chambers, 43 F.3d at 38 ("Pretext may be demonstrated . . . by reliance on the evidence comprising the prima facie case, without more.")).  "[U]nless the employer has come forward with evidence of a dispositive nondiscriminatory reason as to which there is no genuine issue and which no rational trier of fact could reject, the conflict between the plaintiff's evidence establishing a prima facie case and the employer's evidence of a nondiscriminatory reason reflects a question of fact to be resolved by the factfinder after trial." Cronin v. Aetna Life Ins. Co., 46 F.3d 196, 203 (2d Cir. 1995) (citing Chambers, 43 F.3d at 38; see also St. Mary's, 509 U.S. at 511 ("The factfinder's disbelief of the reasons put forward by the defendant[s] . . . may, together with the elements of the prima facie case, suffice to show intentional discrimination.").

The Court must "determine, by looking at the evidence [Altomare] has proffered and the counter-evidence [Defendants have] presented, whether [Altomare] has raised sufficient evidence upon which a reasonable jury could conclude by a preponderance of the evidence that [his] age was a 'but for' cause of [Defendants'] decision to [deny him a promotion and] fire [him]." Gorzynski, 596 F.3d at 107.

Altomare has produced evidence from which a reasonable jury could find that Defendants' reasons for failing to promote him, and for terminating his employment, are false and pretextual. In early 2007 and in April 2008, Altomare received "excellent" and "good" performance evaluations for his work in 2006 and 2007, respectively. (Halter Decl., Ex. 3 (Sandulli Dep.) at 303, Ex. 2 (Silva Dep.) at 216-17, Exs. 12, 16) In 2006, Sandulli and Silva paid Altomare – out of their own pockets – a $25,000 bonus on top of his guaranteed $1,375,000 salary and bonus. (Id., Ex. 3 (Sandulli Dep.) at 312-13) In 2007, Sandulli told Wachovia's human resources department that Altomare should receive a discretionary bonus of $935,000, on top of his $200,000 salary. (Id. at 318-19) Sandulli's favorable evaluation of Altomare in April 2008 took place only a few weeks before he was fired. Moreover, no performance evaluation of Altomare reflects Defendants' present complaint against him – that he failed to develop new insurance-related products that produced revenue for the Company.

Given this proof, the age-related comments, and the alleged pattern of terminating older employees and hiring younger replacements – and viewing the evidence in the light most favorable to Altomare – a reasonable jury could conclude that Defendants' justification for failing to promote Altomare and ultimately terminating his employment was a mere pretext for

discrimination.[9]  Accordingly, Defendants are not entitled to summary judgment on Altomare's age discrimination claims.[10]

III.     **PLAINTIFF'S QUANTUM MERUIT CLAIM**

The Complaint includes a quantum meruit claim in which Altomare seeks to recover bonus compensation for 2008.  (Cmplt. ¶ 77)

A "'plaintiff may only assert a claim of quantum meruit in the absence of an agreement between the parties, be it oral, written or implied-in-fact.'"  Vetromile v. JPI Partners, LLC, 706 F. Supp. 2d 442, 457 (S.D.N.Y. 2010) (quoting Leibowitz, 584 F.3d at 509 n.10). "'The existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter.'"  Broyles v. J.P. Morgan Chase & Co., No. 08 Civ. 3391(WHP), 2010 WL 815123, at *4 (S.D.N.Y. Mar. 8, 2010) (quoting Clark-Fitzpatrick, Inc. v. Long Island R.R. Co., 70 N.Y.2d 382, 388 (N.Y. 1987)).  "'A "quasi contract" only applies in the absence of an express

---

[9]  Defendants argue that the "same actor" inference requires a different result.  The Second Circuit has noted that "when the person who made the decision to fire was the same person who made the decision to hire, it is difficult to impute to her an invidious motivation that would be inconsistent with the decision to hire."  Grady v. Affiliated Cent. Inc., 130 F.3d 553, 560 (2d Cir. 1997).  Here, as noted above, there are material issues of fact regarding Silva's involvement in Altomare's hiring.  Altomare contends that Silva played no substantial role in his hiring but was instrumental in denying him a promotion and in terminating his employment.  Neither side has provided sufficient evidentiary support to permit this Court to rule as a matter of law on this issue.

[10]  Altomare's age discrimination claims are brought under the NYSHRL and the NYCHRL as well as the ADEA.  Traditionally, NYSHRL and NYCHRL age discrimination claims were analyzed under the ADEA framework.  See Leibowitz, 584 F.3d at 498 n.1 (citing Tomassi v. Insignia Fin. Group, Inc., 478 F.3d 111, 114 n.3 (2d Cir. 2007)).  "However, cases decided in the past couple of years have begun to acknowledge that claims brought under the NYCHRL 'must be reviewed independently from and "more liberally" than their federal and state counterparts' in light of the Local Civil Rights Restoration Act of 2005, N.Y.C. Local Law No. 95 (2005)."  Papalia, 2011 WL 6937601, at *7 n.8 (citations omitted).  Here, because the Court finds that Defendants' summary judgment motion fails under the ADEA's more lenient standard, it is not necessary to separately consider Altomare's claims under the NYCHRL.  See id.

agreement, and is not really a contract at all, but rather a legal obligation imposed in order to prevent a party's unjust enrichment . . . .'" Id. (quoting Clark-Fitzpatrick, 70 N.Y.2d at 388).

   Here, the parties agree that Altomare's offer letter and offer summary, and the Incentive Compensation Plan, govern Altomare's claim to bonus compensation. (Pltf. R. 56.1 Counter-Stmt. ¶ 62) Altomare's offer summary states that he will receive an annual salary of $200,000 and will participate in the Incentive Compensation Plan. (Turnbull Decl., Ex. 8) The Plan states that "[t]o be eligible to receive an incentive award under the Plan, participants must be employed on the Pay-Out Notification Date." (Turnbull Decl., Ex. 9) The Plan also makes clear that this rule applies where an employee "terminate[s] employment, for any reason, voluntarily or involuntarily." (Id.) Any bonus award to a terminated employee is within the "sole discretion" of the Plan Administrator. (Id.) Given the clear and explicit terms of the Company's Incentive Compensation Plan, the corporate defendants are entitled to summary judgment on Altomare's quantum meruit claim. See, e.g., Allen v. J.P. Morgan Chase & Co., No. 06 Civ. 8712(JGK), 2009 WL 857555, at *15 (S.D.N.Y. Mar. 31, 2009) ("It is a well-settled principle of New York law that quasi-contract claims such as quantum meruit . . . ordinarily are not available where there is a valid agreement between the parties covering the same subject matter. Because the offer letter and September 21 email covered the subject of the plaintiff's inc[e]ntive compensation, summary judgment dismissing the [plaintiff's] quantum [meruit] . . . claim[] is granted."); DeSantis v. Deutsche Bank Trust Co. Americas, Inc., 501 F. Supp. 2d 593, 600 (S.D.N.Y. 2007) (granting summary judgment dismissing plaintiff's quantum meruit claim where plaintiff argued that defendant had a long-established practice and policy of awarding substantial annual bonuses; because "there is an express provision in the Deutsche Bank Handbook governing the payment of bonuses . . . [which] makes clear that any payment of

bonuses is in the sole discretion of the Bank and that to receive a bonus, an employee must be employed by the Bank on the date bonuses are paid," the bank is entitled to summary judgment); Bessemer Trust Co., N.A. v. Branin, 498 F. Supp. 2d 632, 639 (S.D.N.Y. 2007) ("not only did plaintiff receive a generous salary, but his bonus was at the discretion of the committee.  Since defendant had no contractual right to a bonus above 0% of his salary and his bonus was clearly within the discretion of plaintiff, [his quantum meruit] claim must be dismissed.").[11]

---

[11] Arbeeny v. Kennedy Exec. Search, Inc., 71 A.D.3d 177 (1st Dep't 2010), cited by Altomare, provides no support for his quantum meruit claim.  Arbeeny involves a post-termination claim for commissions.  The court permitted plaintiff's breach of contract claim to proceed, stating that a contract "'cannot be read to enable the defendant to terminate an employee for the purpose of avoiding the payment of commissions which are otherwise owed.'"  Arbeeny, 71 A.D.3d at 184 (quoting Wakefield v. Northern Telecom, Inc., 769 F.2d 109, 112 (2d Cir. 1985)).  Altomare has not argued, nor has he presented any evidence, that Defendants terminated his employment in order to deny him a bonus already earned.  Moreover, in Arbeeny, plaintiff's quantum meruit claim was dismissed because of "the existence of [an] enforceable contract covering the disputed issue of the plaintiff's compensation."  Id. at 180.  Accordingly, Arbeeny supports this Court's determination that Altomare's quantum meruit claim must be dismissed.

## CONCLUSION

For the reasons stated above, Defendants' motion for summary judgment is

denied as to Plaintiff's age discrimination claims, but granted as to the Complaint's Fourth Cause

of Action for quantum meruit. The Clerk of the Court is directed to terminate the motion (Dkt.

No. 19).

In compliance with this Court's individual rules, the parties will submit a joint

pretrial order by March 16, 2012. Proposed voir dire, requests to charge, and any motions in

limine are also due on March 16, 2012. Trial will commence at 9:00 a.m. on April 23, 2012, in

Courtroom 6B of the Daniel Patrick Moynihan Courthouse, 500 Pearl Street, New York, New

York.

Dated: New York, New York
       February 15, 2012

SO ORDERED.

Paul G. Gardephe
United States District Judge